UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RICHARD WHITE, on behalf of himself and all others similarly situated,

    Plaintiff,

- against -

OPTIVER US, LLC, OPTIVER HOLDING BV, OPTIVER VOF, CHRISTOPHER DOWSON, BASTIAAN VAN KEMPEN, RANDAL MEIJER, and JOHN DOES NOS. 1-10,

    Defendants.



Docket No. _____
08 Civ. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

08 CIV. 6976

---

Plaintiff Richard White ("Plaintiff"), by his undersigned attorneys, brings this action against Defendants Optiver US, LLC ("Optiver"), Optiver Holding BV ("Optiver Holding"), Optiver VOF, Christopher Dowson ("Dowson"), Bastiaan van Kempen ("van Kempen"), and Randal Meijer ("Meijer")(collectively, "Defendants"), pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. § 1, *et seq.* (the "CEA"), and New York common law, on behalf of himself and all others who purchased and/or sold New York Mercantile Exchange ("NYMEX") Light Sweet Crude Oil ("light sweet crude oil") futures contracts, NYMEX New York Harbor Heating Oil ("heating oil") futures contracts, and NYMEX New York Harbor Gasoline ("gasoline") futures contracts during the period March 2, 2007 through and including March 26, 2007 (the "Class Period"). Plaintiff's allegations as to himself and his own actions are based upon his personal knowledge and to information obtained during the course of his attorneys' investigation, including but not limited to, a review of the complaint filed by the U.S. Commodity Futures Trading Commission ("CFTC") For Injunctive and Other Equitable Relief and Civil Monetary

Penalties Under the Commodity Exchange Act, Index No. 08 Civ. 6560 (S.D.N.Y)(LAP) against each of the Defendants named herein, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.  This action arises from the Defendants' unlawful manipulation of the prices of (1) NYMEX light sweet crude oil futures contracts, (2) NYMEX heating oil futures contracts, and (3) NYMEX gasoline futures contracts during the Class Period in violation of Sections 9(a)(2) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), as well as New York common law.

2.  In early 2007, Defendants Optiver, Optiver Holding, and Optiver VOF – the U.S. and Netherlands branches of a global proprietary trading fund headquartered in the Netherlands -- developed and, in March 2007, implemented a strategy to manipulate the prices of NYMEX light sweet crude oil futures contracts, heating oil futures contracts, and gasoline futures contracts.

3.  On at least 19 separate instances during the month of March 2007, Defendants led by head traders, Dowson and Meijer, repeatedly manipulated the prices -- or in Dowson's own words, "bully the market" -- for NYMEX light sweet crude oil futures contracts, heating oil futures contracts, and gasoline futures contracts.

4.  Defendants' "bully the market" strategy constituted a long prohibited illegitimate trading strategy also known as "banging the close," "marking the close," "slamming the close" or "painting the tape" – which involved (1) acquiring large positions in a futures contract, and (2) liquidating those positions in a compressed period of time during the final minutes before the close of trading. The Defendants employed this "bully the market" manipulative strategy in the following NYMEX futures contracts and on the following dates:

    a.    crude oil futures contracts:    March 6, 14, 15, 16 and 19

      b.    heating oil futures contracts:   March 9, 13, 19, and 20; and

      c.    gasoline futures contracts:     March 2, 6, 8, 9, 13, 14, 15, 16, 19, and 21.

5.    Defendants' strategy of waiting until the final minutes of trading to liquidate its substantial positions in NYMEX light sweet crude oil futures contracts, heating oil futures contracts, and gasoline futures contracts during the Class Period lacked any legitimate commercial basis and was done with the specific intent by Defendants to manipulate the prices of NYMEX crude oil futures contracts, heating oil futures contracts, and gasoline futures contracts.

6.    By reason of Defendants' unlawful conduct, the prices of NYMEX light sweet crude oil futures contracts, heating oil futures contracts, and gasoline futures contracts were manipulated to artificial levels during the Class Period. As a direct, proximate and foreseeable result thereof, Plaintiff and members of the Class have suffered damages.

## JURISDICTION AND VENUE

7.    Light sweet crude oil, heating oil and gasoline each are a "commodity" and are the "commodity underlying" respectively, NYMEX crude oil futures, heating oil futures and gasoline futures contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

8.    This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

9.    Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d). Each of the Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. Defendants' unlawful acts manipulated the

prices of NYMEX crude oil futures, heating oil futures and gasoline futures contracts which were traded in this district in which NYMEX is located, at One North End Avenue, New York, New York.

10. Defendants, directly and indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

## PARTIES

11. Plaintiff Richard White, a natural person residing in Satellite Beach, Florida, purchased and/or sold NYMEX gasoline futures contracts during the Class Period on the following dates: March 5, March 6, March 7, and March 26. Plaintiff was damaged by reason of Defendants' manipulation which deprived Plaintiff and the Class of a non-manipulated, competitive market in NYMEX gasoline futures contracts.

12. Defendant Optiver is an Illinois company with its principal place of business at 130 E. Randolph Street, Suite 1300, Chicago, IL 60601. Optiver trades commodity futures, options on commodity futures, stocks and stock options listed on organized U.S. exchanges, including NYMEX and the New York Stock Exchange. Optiver is a wholly owned subsidiary of Optra Curacao, which is wholly owned by Optiver Holding BV.

13. Defendant Optiver Holding is a Netherlands corporation with its principal place of business at De Ruyterkade 112, 1022 AB Amsterdam, The Netherlands. Optiver Holding engages in trading activity through its subsidiary companies, including Optiver and Optiver VOF, and manages the activities of its subsidiary companies, including Optiver and Optiver VOF, through its Global Management Board (the "Global Management Board"). In practice, two-

thirds of the profits of Optiver VOF are distributed to Optiver Holding, with the remaining one-third distributed among the other partners of Optiver VOF.

14.     Defendant Optiver VOF is a Netherlands general partnership with its principal place of business at De Ruyterkade 112, 1011 AB Amsterdam, The Netherlands. Optiver VOF is comprised of various partners, including Optiver Holding (through its wholly owned subsidiary Optiver BV), and Defendants Christopher Dowson, Bastiaan van Kempen, and Randal Meijer (through their wholly owned companies, respectively Cobblestones LLC, Randal Derivatives BV, and Platinum Options BV).

15.     Defendant Dowson is a natural person and a citizen of the United Kingdom, currently residing in Chicago, Illinois. Dowson began at Optiver VOF in September 2000 as an equities trader, and in or about January 2007 moved to Chicago and became Head of Trading for Optiver, responsible for Optiver's trading of, among other things, commodity futures contracts, including NYMEX crude oil futures, heating oil futures and gasoline futures. For 2007, Defendant Dowson received approximately $100,000 in U.S. salary and approximately £1,700,000 based on his share in the Optiver VOF partnership. Defendant Dowson controlled Optiver. His responsibilities included Optiver's trading decisions and strategies, including directing and supervising Optiver's TAS (defined at ¶ 36, *infra)* trading strategy and hiring, firing and reviewing the performance of traders. All trades during the Pre-Close and Close (defined at ¶¶ 44, 54, *infra*) were entered into by Globex (defined at ¶ 37, *infra*) under the supervision of Dowson and Meijer.

16.     Defendant van Kempen is a citizen of the Netherlands, currently residing in Chicago, Illinois. Van Kempen began at Optiver Holding in or about October 1998 as a trader and later a director, and moved to Chicago in or about 2001 to head the newly opened Chicago

office. Van Kempen became Chief Executive officer of Optiver in 2003 and has maintained that office to the present. Together with Dowson, van Kempen jointly managed Optiver at all relevant times. For 2007, Defendant van Kempen received approximately $55,000 in U.S. salary and approximately USD $1,600,000 based on his share in the Optiver VOF partnership. Defendant van Kempen controlled Optiver. His responsibilities included supervising the Compliance, Risk Management, Human Resources and IT Departments. Together with Dowson and Meijer, van Kempen determined the amount of bonuses to be given to Optiver's traders. Van Kempen was at all relevant times responsible for the annual compliance meeting and for ensuring adherence to Optiver's compliance manual. Under the immediate direction of Dowson, van Kempen was involved in the development of Optiver's TAS trading strategy and he directly supervised Optiver's traders when Dowson was away.

17.   Defendant Meijer has at all relevant times been Head of Trading, supervising the trading activity of each of Optiver Holding's subsidiaries, including Optiver and Optiver VOF. Meijer is one of five members of Optiver Holding's Global Management Board, which oversees Optiver, Optiver VOF and other affiliated entities. For 2007, Defendant Meijer received approximately £1,700,000 based on his share in the Optiver VOF and shareholder dividends from Optiver Holding. Defendant Meijer controlled Optiver. His responsibilities as a member of the Global Management Board included the appointment of Dowson as head trader in Chicago and setting the risk limits for Defendants' manipulative scheme. Meijer directly participated in the development and supervision of the manipulative scheme. Defendant Dowson's authority to implement the manipulative strategy was subject to Meijer's approval. Van Kempen and Dowson regularly reported to Meijer on matters of trading and compliance, including regular weekly telephone conferences. All trades during the Pre-Close and Close were entered into by

Globex under the supervision of Dowson and Meijer.

18.     Plaintiff alleges on information and belief that at all relevant times, Defendants John Does Nos. 1-10, inclusive, were also engaged in the manipulation of NYMEX light sweet crude oil futures contracts, heating oil futures contracts, and gasoline futures contract prices as alleged herein. Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as John Does Nos. 1-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does Nos. 1-10, inclusive.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on his own behalf and as representative of a class ("Class") defined as all persons, corporations and other legal entities (other than Defendants, their employees, affiliates, and co-conspirators) that purchased or sold NYMEX light sweet crude oil futures contracts, heating oil futures contracts, and gasoline futures contracts during the period March 2, 2007 through and including March 26, 2007.

20.     The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believe that at least thousands of geographically dispersed Class members traded NYMEX light sweet crude oil futures contracts, heating oil futures contracts, and gasoline futures contracts during the Class Period.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. These common questions of law and fact include, without limitation:

  a. Whether Defendants' "bully the market" strategy constituted a manipulative or unlawful act;

  b. Whether Defendants injected into NYMEX light sweet crude oil, heating oil and gasoline futures contracts illegitimate forces of supply and demand;

  c. Whether Defendants manipulated prices in violation of the CEA;

  d. Whether Defendants unjustly enriched themselves or are otherwise responsible for restitution under the common law;

  e. The fact and degree of impact on futures contract prices of Defendants' course of unlawful conduct; and

  f. The appropriate measure of relief.

22. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

23. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation class action litigation.

24. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and

without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

25.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## SUBSTANTIVE ALLEGATIONS

**I.     Background**

26.     NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. NYMEX submits to the CFTC various rules and regulations for approval through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options, including for light sweet crude oil futures contracts, heating oil futures, and gasoline futures contracts.

27.     A futures contract is an agreement to buy or sell a commodity, such as gasoline, at a date in the future. Every aspect of a futures contract traded on the NYMEX, such as the contracts for light sweet crude oil, heating oil, and gasoline futures, is standardized, except the price. Futures markets are specifically designed to facilitate and ease trading in one central market place for traders who are located throughout the United States.

28.     Futures contracts have two sides. The "long" side is the buyer of the contract and is obligated to take delivery and pay for the commodity if the buyer holds the contract until the

delivery date. The "short" side is the seller of the contract and is obligated to make delivery of the commodity on the delivery date.

29.     Only a small percentage of all futures contracts traded each year result in delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of gasoline by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

30.     The NYMEX light sweet crude oil futures contract trades in units of 42,000 gallons (1,000 U.S. barrels) of West Texas Intermediate light sweet crude oil ("WTI"), and the delivery point is Cushing, Oklahoma.

31.     The price for the NYMEX crude oil futures contract is quoted in U.S. dollars and cents per barrel and the minimum price fluctuation (also known as one "tick") is $0.01 per barrel ($10.00 per contract).

32.     The NYMEX heating oil contract trades in units of 42,000 gallons (1,000 U.S. barrels) and is based on delivery in New York harbor, which is the principal cash market trading center.

33.     The price for the NYMEX heating oil contract is quoted in U.S. dollars and cents per gallon and the minimum price fluctuation (or one "tick") is $0.0001 per barrel (0.01¢) per gallon ($4.20 per contract).

34.     The NYMEX gasoline futures contract trades in units of 42,000 gallons (1,000 U.S. barrels) and is based on delivery at petroleum products terminals in New York harbor.

35.     New York Harbor gasoline is a wholesale non-oxygenated blendstock traded in

the New York harbor barge market.

36.     NYMEX also permits Trading at Settlement contracts ("TAS contracts") in the subject futures contracts. TAS contracts are futures contracts in a specified commodity which are priced at the settlement price on a specified date plus or minus an agreed amount. TAS contracts are offset by an opposite trade in the corresponding NYMEX futures contract.

37.     The subject futures contracts and TAS contracts may be traded on the NYMEX trading floor by open outcry trading, from 9:00 AM until 2:30 PM, and may also be traded electronically on the CME/Globex platform ("Globex") from 6:00 PM the previous calendar day until 2:30 PM.

38.     NYMEX rules also permit, in certain circumstances, the subject futures to trade in a two-minute session after the close of trading (the "Post-Close").

39.     TAS contracts are available for trading for the front two months, *i.e.*, the upcoming delivery month and the following delivery month, except on the last day of trading for the underlying futures contract. During March 2007 those front two months were the April and May 2007 crude oil futures contracts, the April and May 2007 gasoline futures contracts, and the April and May 2007 heating oil contracts.

40.     TAS contracts are priced either at par (100 points) or based on a differential (plus or minus) from settlement in the underlying product. The maximum differential is 10 "points" or "ticks" from the settlement, *i.e.*, TAS contracts are traded in a range from 110 to 90. One point or tick in a TAS contract corresponds to the minimum price fluctuation in the underlying future. Because TAS contracts are priced according to the settlement price for the underlying futures, if a trader with a TAS position can successfully trade futures in the opposite direction, such that the average price of its futures trades is equal to the final settlement price, the price of the futures

trades would equal the price of the TAS trades, adjusting for any differential.

41. A trader buying and selling TAS contracts can make a profit equal to the differential, a practice known as "scalping."

42. A trader can also profit by selling TAS contracts for a premium (101 or above) or buying it at a discount (99 or below) and subsequently trading futures contracts in the opposite direction for an average price equal to or better than the settlement price.

43. Pursuant to NYMEX rules, the settlement price of futures contracts is established by the NYMEX settlement committee at the close of each trading session as the official price to be used by the clearinghouse in determining net gains or losses, margin requirements, and the next day's price limits.

44. In accordance with NYMEX rules and procedures, at all relevant times the settlement price for the crude oil futures contract, the gasoline futures contract, and the heating oil futures contract were derived by calculating the volume-weighted average of the prices ("VWAP") at which trades were conducted during the Close, *i.e.*, from 2:28 to 2:30 PM.

## II. Defendants' Manipulative Conduct

45. In or about January 2007, Optiver, under Defendant Dowson's direction, began trading TAS contracts for crude oil, heating oil, and gasoline.

46. In March 2007, Defendants developed and implemented their manipulative strategy.

47. In order to effectuate their manipulation to "hammer," "whack," or "bully" the prices of NYMEX crude oil, heating oil, and gasoline futures contracts, the Defendants accumulated a large net long or short TAS position in the subject commodity (*e.g.*, gasoline).

48. Beginning at or about 6:00 PM, when a new session of TAS trading began on

NYMEX, Optiver began entering orders for TAS contracts for the following day, placing a series of orders to buy TAS contracts at a range of prices and series of orders to sell an approximately equal number of TAS contracts also at a range of prices.

49.     The Globex system operated on a "first in, first out" system, meaning that bids and offers quoted at the same price would be executed based on the order in which they were entered in to the system. However, in the Globex system, an offer to sell at a lower price, or to buy at a higher price, would be placed in the queue for execution ahead of pre-existing orders at less competitive prices.

50.     To ensure that their orders were first in the queue, Defendants used an Excel spreadsheet, which had been developed for Optiver to work with the Eccoware system Optiver used to place its order on Globex. The program was designed to rapidly enter a series of orders into Globex and was referred to by Optiver as the "Hammer."

51.     Optiver's traders had frequent discussions about improving the "Hammer" to make sure Optiver's orders were getting into the system first.

52.     Typically, a few trades were executed overnight and Optiver's TAS trades would take place the following day. Throughout the trading day, Dowson or other traders under his direction would adjust Optiver's orders -- cancelling or modifying existing orders and placing new ones -- often thereby increasing Optiver's net long or short TAS position in a manner that resulted in Optiver accumulating a net long or short TAS position.

53.     By approximately 2:25 PM, Optiver typically had accumulated a large net long or short position in TAS contracts for crude oil, heating oil, and/or gasoline.

54.     Beginning at approximately 2:25 up until 2:27:59 (the "Pre-Close"), Optiver typically executed 20-30% of the futures trades called for under Defendants' manipulative

scheme.

55.     Defendants intended for Optiver's Pre-Close trades to begin driving the price of NYMEX crude oil, heating oil, and/or gasoline futures contracts in a certain direction.

56.     Defendants' ultimate goal was to ensure that there would be a significant and favorable price differential between the futures contracts Optiver traded during the Pre-Close and the settlement price, which would, in turn, determine the value of Optiver's TAS position.

57.     Because the future contracts traded directly offset the TAS contract, if Optiver could trade 20-30% of its futures contracts during the Pre-Close for a price better than the settlement price and trade the remaining 70-80% of its futures contracts, during the Close, for a weighted average price close to the settlement price, Optiver would achieve a significant profit overall.

58.     According to Meijer, the Defendants' manipulative scheme was all "built on the idea that we can control the VWAP." VWAP (as alleged in ¶ 44, *infra*) is the volume-weighted average of the prices at which trades are conducted during the Close, *i.e.*, from 2:28 to 2:30 PM.

59.     Because the settlement price is equal to the VWAP during the Close, Defendants wanted to ensure that Optiver's trades during the Close were executed at an average price close to or better than the VWAP.

60.     During the Close, Defendants intended for Optiver to execute approximately 60% of its planned trades of futures contracts within the first minute and the remaining 40% in the second minute.

61.     All of Defendants' futures contracts trades during the Pre-Close and the Close were entered into Globex by traders under the supervision of Defendants Dowson and Meijer.

62.     Defendants maintained a software program developed in-house, which processed

information about prices and quantities of trades being executed and showed a running calculation of the VWAP during the Close.

63.  Throughout March 2007, Defendants and other Optiver and Optiver VOF employees engaged in discussions and communications which reveal the details of how their plan was executed and reflect their manipulative intent during the 19 instances in March 2007 to, after having accumulated a significant net long or short TAS position, trade a significant volume of futures contracts in the opposite direction during the Pre-Close and Close.

64.  Many of these conversations evidence the Defendants' manipulative intent to "hammer," "influence," "push," "move," "whack," and "bully" the prices of NYMEX gasoline, crude oil, and heating oil futures contracts.

65.  Contrary to these internal e-mails and recorded telephone conversations, Defendants falsely represented to NYMEX compliance that Defendants were engaged in innocent trading.

   a.  On or about March 19, 2007, NYMEX officials sent a Compliance Advisory, which was forwarded to Defendant van Kempen by Fortis Clearing Americas, reminding that "misuse of TAS . . . trades to acquire a position in order to unfairly effect or attempt to unfairly effect a settlement price [*sic*] the member and/or the customer to disciplinary action for any of a number of rule violations including but not limited to attempted price manipulation . . . ."

   b.  On or about March 26, 2007, Optiver and van Kempen falsely stated in response to questions from NYMEX compliance that "what we're trying to do is just make markets in the TAS contract and hedge ourselves as well as possible during the closing period and maybe slightly before. But you gotta do it before 1:30 'cause afterwards liquidity dries up

completely."

        c.        Optiver and van Kempen thereby willfully falsified, concealed and covered up a material fact or made false, fictitious or fraudulent statements or misrepresentations in violation of Section 9(a)(4) of the CEA, 7 U.S.C. § 13(a)(4).

66.        In or about the first week of April 2007, Optiver stopped its practice of recording its telephone lines.

### AS AND FOR A FIRST CLAIM FOR MANIPULATION AND ATTEMPTED MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
(7 U.S.C. § 1, *et seq.*)

67.        Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

68.        By their conduct, the Defendants each violated Sections 9(a)(2) of the Act, 7 U.S.C. § 13(a)(2), and caused prices of NYMEX crude oil, heating oil, and gasoline futures contracts to be artificial during the Class Period.

69.        Defendants' trading and other activities alleged herein constitute market power manipulation of the prices of NYMEX crude oil, heating oil, and gasoline futures contracts in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

70.        Defendants' foregoing extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

71.        Plaintiff purchased and sold NYMEX gasoline futures contracts during the Class Period, and was injured as a result of the Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*

72.        Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

## AS AND FOR A SECOND CLAIM FOR
## AIDING AND ABETTING AND CONTROL PERSON LIABILITY FOR
## MANIPULATION

73. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

74. To any extent that any Defendant is not liable under the first claim for relief, then that Defendant is liable under this claim.

75. Defendant Optiver made and benefitted from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodity Exchange Act by the other Defendants, and each of them.

76. Defendant Optiver Holding supervised the making of and benefitted from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodity Exchange Act by the other Defendants, and each of them.

77. Defendant Optiver VOF, by and through its partners Optiver Holding, Dowson, Meijer and van Kempen, benefitted from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodity Exchange Act by the other Defendants, and each of them.

78. Defendant Dowson participated in the development of the manipulative scheme and participated in the execution of, and supervised, the manipulative trades. Dowson also benefitted from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodity Exchange Act by the other Defendants, and each of them.

79. Defendant van Kempen participated in the development of the manipulative scheme and monitored the manipulative trades. Van Kempen also benefitted from the

manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodity Exchange Act by the other Defendants, and each of them.

80. Defendant Meijer participated in the development of and approved the manipulative scheme and directed the manipulative trades. Meijer also benefitted from the manipulative trades and willfully aided, abetted, counseled, induced, or procured the commission of violations of the Commodity Exchange Act by the other Defendants, and each of them.

### AS AND FOR A THIRD CLAIM FOR
### UNJUST ENRICHMENT AND RESTITUTION

81. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

82. It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of Plaintiff and members of the Class.

83. Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

84. Alternatively or additionally, each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A) That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

(B) That judgment be entered against Defendants in favor of Plaintiff and the Class;

(C) That Plaintiff and Class members recover damages, restitution, and/or Defendants'

unjust enrichment;

(D)   That a constructive trust be temporarily, preliminarily, permanently or otherwise impressed on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(E)   That Plaintiff and the Class recover their costs of the suit, including attorneys' fees; and

(F)   That prejudgment interest and such further relief as the Court may deem just and proper, be awarded to Plaintiff and members of the Class.

### JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: White Plains, NY
August 5, 2007

> LOWEY DANNENBERG COHEN
> & HART, P.C.
>
> By: ___/s/ Vincent Briganti___
>
> Vincent Briganti, Esq. (VB-1497)
> Geoffrey Horn, Esq. (GH - 4179)
> One North Broadway
> White Plains Plaza, 5th Floor
> New York, New York 10601
> 914-997-0500
>
> *Attorneys for Plaintiff*